# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| **United States of America,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Criminal Action Number** |
| ) | **14-00115-01-CR-W-DW** |
| **Eleuterio Murillo-Salgado,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE AND STATEMENT (Doc. #27) filed on February 12, 2015, by defendant Eleuterio Murillo-Salgado ("Salgado"). On June 17, 2015, the undersigned held an evidentiary hearing on Salgado's motion. Salgado was present and was represented by his counsel, William Raymond. The government was represented by Assistant United States Attorney Patrick Edwards. At the evidentiary hearing, two witnesses testified: Sgt. Larry Allen and Sgt. Mark Wilhoit with the Missouri State Highway Patrol. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Video |
| Gov't. #2 | Photograph |
| Gov't. #3 | Photograph |
| Gov't. #4 | Photograph |
| Gov't. #5 | Photograph |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

1

## PROPOSED FINDINGS OF FACT

1. On April 7, 2014, Sergeant Larry Allen and Sergeant Mark Wilhoit were working with the Missouri State Highway Patrol. Tr. at 3, 47.

2. On that date, while patrolling, Sgt. Allen observed a 4-door truck (a Nissan Frontier) travelling in the passing lane (but not passing any vehicles) of southbound Interstate 29 in Holt County, Missouri. Tr. at 3, 5, 24-25.

3. The truck was travelling three miles in excess of the posted speed limit of 70 mph. Tr. at 3, 25-26.

4. Sgt. Allen proceeded to pull the truck over. Tr. at 4, 26.

5. As Sgt. Allen approached the stopped the truck, he observed a driver and passenger in the front seat. Tr. at 4, 27; Gov't Ex. 1.

6. Sgt. Allen also observed a couple of luggage containers and an air compressor in the back part of the truck's cab. Tr. at 5, 30.

7. Officer Allen further observed three packages of new electrical wiring, a small ladder, a hard hat, and an "electrical type box" in the bed of the truck. Tr. at 5, 29-30.

8. The driver identified himself as Ramon Arredondo and produced a California driver's license. Tr. at 4-5, 28.

9. Both driver and the passenger said they were headed to North Carolina. Tr. at 28; Gov't Ex. 1.

10. Sgt. Allen then told the driver he needs to slow down and drive in the right lane, but he was only giving them a warning as opposed to a ticket. Tr. at 28; Gov't Ex. 1.

11. Sgt. Allen requested that Arredondo come back to the patrol car so he could write up the warning while Sgt. Allen obtained additional information. Tr. at 4-5, 29-30; Gov't Ex. 1.

12. Sgt. Allen had Arredondo sit in the front seat (passenger side) of the patrol car. Tr. at 6; Gov't Ex. 1.

13. In the patrol car, Arredondo handed Sgt. Allen a rental agreement for the truck that had been signed with the last name "Gonzalez." Tr. at 6, 8, 28; Gov't Ex. 1.

14. The truck had been rented in California on April 5 and was due back on April 10. Tr. at 7.

2

15. Arredondo told Sgt. Allen that he was coming from San Jose, California and heading to North Carolina to install electrical wiring in a house and they were going to "get big money" for the job. Tr. at 6, 32; Gov't Ex. 1.

16. Initially, Arredondo said that both he and his passenger were electricians. Tr. at 7; Gov't Ex. 1.

17. On further questioning (when asked about the specific wiring in the truck), Arredondo changed his story and said that he himself was not an electrician but a helper who "just drill[ed] the holes." Tr. at 13, 37 ; Gov't Ex. 1.

18. When Sgt. Allen asked why they had not flown to North Carolina, Arredondo stated that they were bringing equipment and had bought all of the wire necessary to supply thet house they were going to work on. Tr. at 7; Gov't Ex. 1.

19. Arredondo said that both he and his passenger had loaded the items onto the truck. Tr. at 13; Gov't Ex. 1.

20. Sgt. Allen then left Arredondo in the patrol car and approached the passenger in the truck. Tr. at 8; Gov't Ex. 1.

21. As Sgt. Allen approached the truck, he saw that the passenger was talking on his cell phone. Tr. at 8.

22. Sgt. Allen believed that the passenger was trying to talk on his cell phone without it appearing as though he was actually using the phone. Tr. at 8-9, 37-38.

23. The passenger said that he was on the phone with his contractor. Tr. at 38.

24. Sgt. Allen asked for identification and the passenger produced an Oregon driver's license for Eleuterio Salgado. Tr. at 9.

25. Salgado told Sgt. Allen that he had lived in Oregon for ten years before moving to California six years earlier. Tr. at 10; Gov't Ex. 1.

26. Salgado told Sgt. Allen that he was going to North Carolina to do electrical work on a huge 15,000 square-feet mansion. Tr. at 10.

27. Sgt. Allen did not believe that the truck contained sufficient wiring or tools for the two men to rewire a 15,000 square-feet residence. Tr. at 11-12

28. Sgt. Allen then returned to his patrol car to make a computer inquiry regarding Salgado. Tr. at 10; Gov't Ex. 1.

29. Sgt. Allen learned that Salgado did not have a driver's license but did have a prior criminal history. Tr. at 12.

3

30. Sgt. Allen asked Arredondo (who was still seated in the patrol car) if there were drugs, weapons or stolen items in the truck and Arredondo said no. Tr. at 12, 40; Gov't Ex. 1.

31. Sgt. Allen then asked if he could search the truck with the following exchange occurring:

| | |
|---|---|
| Sgt. Allen: | There's no drugs, guns, stolen objects in the truck? |
| Arredondo: | No. |
| Sgt. Allen: | There is no marijuana in there? |
| Arredondo: | No. |
| Sgt. Allen: | Cocaine? |
| Arredondo: | No. |
| Sgt. Allen: | No heroin? |
| Arredondo: | No. |
| Sgt. Allen: | Methamphetamine? |
| Arredondo: | No |
| Sgt. Allen: | Can I search the truck? |
| Arredondo: | Yeah. |
| Sgt. Allen: | Do you two own everything in there? |
| Arredondo: | Not everything. |
| Sgt. Allen: | What all do you own? |
| Arredondo: | Just my clothes and everything else. Well, my clothes. |
| Sgt. Allen: | Do you have like one bag . . . |
| Arredondo: | Two bags |

4

| | | |
|---|---|---|
| Sgt. Allen: | | . . . or two bags? Okay. Is that all you own? You don't own any of the tools, tool bags . . . |
| Arredondo: | | No |
| Sgt. Allen: | | . . . anything like that? Nothing? |
| Arredondo: | | No. |
| Sgt. Allen: | | Okay, that's it for you? He owns everything else? |
| Arredondo: | | Yeah. Well, we own the wire |
| Sgt. Allen: | | We? You or him? |
| Arredondo: | | We, well him. |
| Sgt. Allen: | | Or collectively? |
| Arredondo: | | Collectively, we both . . . . |
| Sgt. Allen: | | Okay, alright. |

Gov't Ex. 1.

32. After a brief wait for Sgt. Wilhoit to arrive at the scene, Sgt. Allen again approached Salgado and asked about his criminal history. Tr. at 14; Gov't Ex. 1.

33. Salgado told the officer it involved a little cocaine. Tr. at 14.

34. Sgt. Allen then asked Salgado if there was any marijuana, cocaine, methamphetamine or heroin in the truck to which Salgado said no. Gov't Ex. 1.

35. Sgt. Allen did not ask for Salgado's consent to search the truck or any of its contents. Gov't Ex. 1.

36. Sgt. Allen then had Salgado get out the vehicle. Tr. at 41.

37. Sgt. Allen and Sgt. Wilhoit then began searching the vehicle. Tr. at 48; Gov't Ex. 1.

38. After the officers opened the front driver's side and passenger doors, Sgt. Allen opened the rear passenger door and clearly saw the air compressor in the back seat. Tr. at 14-15, 42, 48-49; Gov't Ex. 1.

5

39. Sgt. Allen immediately could smell fresh paint and noted non-factory welding on the top of the air tank portion of the air compressor (where the top compressor motor attaches to the air tank). Tr. at 14-15, 42-43, 49.

40. Sgt. Allen then stated "Man there is just something about this that just ain't right." Gov't Ex. 1.

41. After bending down to look closely at the air compressor, Sgt. Allen stated to Sgt. Wilhoit "I think it's in here. I think it's in this air compressor." Gov't Ex. 1.

42. The officers then removed the air tank from the back seat of the truck and Sgt. Allen observed a square cut that had been made in the air tank portion of the air compressor (and then welded shut again). Tr. at 15.

43. The welds were very rough and jagged. Tr. at 16.

44. The officers also believed that the air compressor felt heavier than it should. Tr. at 16.

45. The officers then used a density buster (described as a "glorified stud finder") on the air tank portion of the air compressor and obtained readings that indicated there was something solid in the air tank. Tr. at 16-17, 43-44, 50 Gov't Ex. 1.

46. The officers then used a stethoscope and tapped the side of the air tank and based on the sounds heard, they believed there was something inside the air tank portion of the air compressor. Tr. at 16-17, 43 Gov't Ex. 1.

47. The officers then placed the air compressor on the open tailgate of the truck and, using a pair of pliers, removed the petcock (bleeder valve) from the air tank. Tr. at 18, 44-45, 50, 54.

48. With the petcock removed, the officers could see gray/silver duct tape inside the air tank. Tr. at 18, 50.

49. At that point both Arredondo and Salgado were placed under arrest, handcuffed, and advised of their *Miranda* rights. Tr. at 18, 51.

50. Sgt. Wilhoit then inserted a probe into the air tank that indicated white powder in the tank that the officers believed to be cocaine. Tr. at 18-19, 50-51, 54.

51. Subsequently, the air tank on the air compressor was opened and several packages of cocaine were recovered. Tr. at 21-23.

**PROPOSED CONCLUSIONS OF LAW**

In his motion to suppress, Salgado objects to the warrantless search of the air compressor. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses,[1] papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the
> common law, than the right of every individual to the possession
> and control of his own person, free from all restraint or interference
> of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 1001 (1891).

Undoubtedly, "[a] traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008). However, it is well settled that "[a]n officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." *Id*. Similarly, "it is well established that a traffic violation – however minor – creates probable cause to stop . . . a vehicle." *United States*

---

[1] The stop of an individual in an automobile raises many of the same concerns as a search of an individual's home.

> Undoubtedly, many find a greater sense of security and privacy in traveling
> in an automobile than they do in exposing themselves by pedestrian or other
> modes of travel. Were the individual subject to unfettered governmental
> intrusion every time he entered an automobile, the security guaranteed by
> the Fourth Amendment would be seriously circumscribed. [P]eople are not
> shorn of all Fourth Amendment protection when they step from their homes
> . . . into their automobiles.

*Delaware v. Prouse, 440 U.S. 648, 662-63, 99 S. Ct. 1391, 1400-01 (1979).*

7

*v. Lyons*, 486 F.3d 367, 371 (8th Cir.2007). Indeed, such probable cause is not defeated even if there is an inference that that an officer conducts a traffic stop for an ulterior motive. *See*, *e.g.*, *United States v. Wright*, 512 F.3d 466, 471 (8th Cir.2008) ("An otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search."). In this case, Sgt. Allen observed the Nissan Frontier traveling above the posted speed limit. This observed violation was a legitimate basis for conducting a traffic stop. *See*, *e.g.*, *United States v. Rodriguez-Lopez*, 444 F.3d 1020, 1023 (8th Cir. 2006).

Moreover, once the valid traffic stop was initiated, Sgt. Allen was entitled to question both Arredondo and Salagdo. The Supreme Court has analogized such roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to detain an individual in order to ask "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (*quoting Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984)). As such, "[d]uring a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009) (*citations omitted*). To that end, "[a] reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005).

Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupants "must not be excessively intrusive in that the officer's actions must be reasonably related in scope to the circumstances justifying the initial interference." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). However, if an officer's suspicions

8

become heightened during the course of such routine traffic stop, the officer may be justified in expanding the scope of the investigation (and lengthening the time of the stop). *United States v. Coleman,* 700 F.3d 329, 335 (8th Cir. 2012) ("[I]f the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion."). More specifically:

> If during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for greater intrusion unrelated to the traffic offense.

*United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994). In this case, in performing a routine traffic stop, Sgt. Allen was confronted with enough information to expand the scope of the encounter, including inconsistencies and improbabilities in the stories of Arredondo and Salgado.

However, concluding that the initial stop of the Nissan Frontier was justified under the Fourth Amendment and that Sgt. Allen was reasonable in his treatment of Arredondo and Salgado are only preliminary inquiries. Not every proper traffic stop justifies the warrantless search of the stopped vehicle and its contents. In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. In this case, of course, Sgt. Allen did not have a warrant to search the vehicle. However, over the years, many exceptions to the warrant requirement have been recognized. Nonetheless, the Supreme Court has cautioned:

> [S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009). In this case, the government relies on two longstanding theories to justify the search of the air compressor – consent to search and plain view. The Court will address each in turn.

It is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801 (1991). In this case, consent must be examined at two levels: first, did Arredonda voluntarily consent to a search of the vehicle, and, second, did that consent cover the air compressor.

When, as in this case, a search conducted pursuant to alleged consent is subsequently challenged by a defendant, the touchstone in analyzing a motion to suppress is whether the consent was "voluntary." In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047-48 (1973). To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding a consent, courts will examine whether the person who consented:

> (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

10

In this case, and after making credibility findings of the testimony given at the evidentiary hearing and, in particular after viewing the dashcam footage, the Court concludes that Arredondo voluntarily consented to the search of the Nissan Frontier. Arredondo was an adult at the time of the incident who appeared to have basic general intelligence and the ability to comprehend what was being said to him. Arredondo did not appear on tape or to Sgt. Allen to be under the influence of drugs or otherwise impaired. There was no evidence that Arredondo was threatened or received any improper promises. Finally, once begun, Arredondo never objected to the search of the Nissan Frontier even though he was only a short distance away watching the search progress.

As to a general search of the Nissan Frontier, there is no evidence that Salgado had any ownership or possessory interest in the Nissan Frontier, which had been rented in Arredondo's name only. Fourth Amendment rights are personal, and a defendant moving to suppress a search has the burden of proving a reasonable expectation of privacy in the area searched. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). To that end, in general, a mere passenger who has no ownership rights in a vehicle lacks standing to challenge a search of that vehicle. *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004). Notwithstanding the foregoing, Salgado asserts that Arredondo's consent did not extend, and could not have extended, to the air compressor because Arredondo expressly disclaimed any ownership interest in the air compressor prior to the search of the Nissan Frontier and specifically and unequivocally stated that the "tools" on the truck were owned by Salgado. Because of its centrality to the legal analysis, it is worth quoting verbatim the conversation between Arredondo and Sgt. Allen at 11:01:01-11:01:50 of the dashcam video:

| | |
|---|---|
| Sgt. Allen: | There's no drugs, guns, stolen objects in the truck? |
| Arredondo: | No. |
| Sgt. Allen: | There is no marijuana in there? |
| Arredondo: | No. |
| Sgt. Allen: | Cocaine? |
| Arredondo: | No. |
| Sgt. Allen: | No heroin? |
| Arredondo: | No. |
| Sgt. Allen: | Methamphetamine? |
| Arredondo: | No. |
| Sgt. Allen: | Can I search the truck? |
| Arredondo: | Yeah. |
| Sgt. Allen: | Do you two own everything in there? |
| Arredondo: | Not everything. |
| Sgt. Allen: | What all do you own? |
| Arredondo: | Just my clothes and everything else. Well, my clothes. |
| Sgt. Allen: | Do you have like one bag . . . |
| Arredondo: | Two bags, |
| Sgt. Allen: | . . . or two bags? Okay. Is that all you own? You don't own any of the tools, tool bags . . . |
| Arredondo: | No. |
| Sgt. Allen: | . . . anything like that? Nothing? |

| | |
|---|---|
| Arredondo: | No. |
| Sgt. Allen: | Okay, that's it for you? He owns everything else? |
| Arredondo: | Yeah. Well, we own the wire. |
| Sgt. Allen: | We? You or him? |
| Arredondo: | We, well him. |
| Sgt. Allen: | Or collectively? |
| Arredondo: | Collectively, we both . . . . |
| Sgt. Allen: | Okay, alright. |

Generally, in order to uphold a consensual search, the government must show that the search did not exceed the scope of the consent given. *United States v. Siwek*, 453 F.3d 1079, 1084 (8th Cir. 2006). In that regard, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Starr*, 533 F.3d 985, 995 (8th Cir. 2008) (*quoting Florida v. Jimeno*, *supra*, 500 U.S. at 251, 111 S. Ct. at 1803-04). The scope is generally defined by the "expressed object" of the search. *Id.* at 251, 111 S. Ct. at 1804.

In this case, the object of the search (drugs, guns or stolen property) meant that "[i]t was objectively reasonable for [the officer] to search any part of the truck where these items might be stored. *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006). *See also United States v. Alcantar,* 271 F.3d 731, 738 (8th Cir. 2001) ( "[W]hen an officer receives consent to search for an item that can be easily hidden, the officer may conduct a sufficiently thorough search to find those items."). Further, as noted by the Court in *Siwek* (where an officer inserted a probe into a drain hole on a truck):

13

> For purposes of the Fourth Amendment, there is no meaningful
> distinction between probing a drain hole and searching inside of a
> closed but unlocked container within a vehicle.

*Siwek*, 453 F.3d at 1085 (*citing Jimeno,* 500 U.S. at 252, 111 S. Ct. at 1804 (defendant's consent to search vehicle "would reasonably be understood to extend to a particular container [and] the Fourth Amendment provides no grounds for requiring a more explicit authorization" to open container).

A closely related, but equally important, legal issue is whether the person consenting to a search has the authority to give the consent. This may be either actual authority or apparent authority. When considering actual authority, "ownership is not the *sine qua non* of authority to consent." *United States v. Jenkins*, 46 F.3d 447, 455 (5th Cir. 1995). Instead:

> The authority which justifies the third-party consent does not rest
> upon the law of property, with its attendant historical and legal
> refinements, but rests rather on mutual use of the property by
> persons generally having joint access or control for most purposes.

*United States v. Matlock,* 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7 (1994). Although there was limited evidence that Arredondo acted as "helper" to Salgado, there is no evidence in the record that Salgado had joint access or mutual use of the air compressor.

However, that still leaves open the possibility of apparent authority. *Compare United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998) ("For a third-party consent to a warrantless police search to be legally effective, the consenting party must have actual or apparent authority to give the consent."). To that end:

> Valid third party consent can arise either through the third party's
> actual authority or the third party's apparent authority. . . . [A] third
> party has apparent authority to consent to a search when an officer
> reasonably, even if erroneously, believes the third party possesses
> authority to consent.

14

*United States v. Chavez Loya*, 528 F.3d 546, 554 (8th Cir. 2008) (*citation omitted*). Thus, the "relevant inquiry is whether the facts available would have justified a reasonable officer in the belief" that the consenting party had authority over the property to be searched. *Id*. (*quoting United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997)). In this case, the Court cannot conclude that Sgt. Allen reasonably believed that Arredondo had authority to consent to a search of the air compressor after he was told that Salgado owned the tools on the truck. The Eighth Circuit's decision in *United States v. Munoz*, 590 F.3d 916 (8th Cir. 2010) is instructive.

In *Munoz*, the driver of a stopped vehicle gave an officer consent to search his vehicle. The officer thereafter searched the vehicle, including a backpack that was later determined to belong to a passenger. The passenger was present at the traffic stop but did not hear the driver give consent to search, and did not independently give consent to search his backpack. The Court noted that the validity of the consent turned on apparent authority which could only be found if "the facts available to the officer at the moment . . . warrant[ed] a man of reasonable caution in the belief that the consenting party had authority over the thing searched." *Id*. at 922.

> [The passenger] was the owner of the backpack. There is no evidence that [the driver] had joint use of it, and therefore, she did not have common authority over it. [The driver's] consent to search the Pontiac did not include [the passenger's] backpack. [The officer] also did not reasonably believe that [the driver] had authority to consent to the search of the backpack, as there were two people in the car who each had been sitting in the passenger seat during the trip. In fact, [the trooper] testified that, at the time of opening the backpack, he did not know whose it was. Because [the passenger] did not consent to the search of his backpack, his Fourth Amendment rights were violated by the search.

*United States v. Munoz*, 590 F.3d 916, 922-23 (8th Cir. 2010) (*citing United States v. Welch,* 4 F.3d 761, 764 (9th Cir. 1993) (male occupant of rental car did not have the authority to consent to the search of female occupant's purse)).

15

In *Munoz*, the Eighth Circuit found that the officer could not have reasonably believed that the driver had authority to consent to the search since the facts before the officer cast doubt as to the owner of the backpack. In this case, there is not even such doubt – Arredondo told Sgt. Allen that Salgado owned the tools on the truck. *Compare United States v. Poulack*, 82 F.Supp.2d 1024, 1037 (D. Neb. 1999) ("The apparent authority doctrine, however, has no application in this case, because [the officer] was not arguably mistaken as to any essential facts, *i.e.*, there was no question that [the driver who consented to a search] rented the vehicle and that the sealed boxes in the back of the truck belonged exclusively to [the passenger]."). Based on the record before it, the Court concludes that Arredondo's consent to search the Nissan Frontier – while voluntary – did not extend to the tools owned by Salgado.

Nonetheless, the consensual search is important because it did entitle Sgt. Allen to look into and generally survey the interior of the truck. In performing that valid search, Sgt. Allen saw the air compressor in "plain view." The plain view doctrine allows officers to seize an object without a warrant if:

(1)   the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,

(2)   the object's incriminating character is immediately apparent, and

(3)   the officer has a lawful right of access to the object itself.

*United States v. Collins,* 321 F.3d 691, 694 (8th Cir. 2003). Given the validity of the consent search of the Nissan Frontier generally, Sgt. Allen can easily meet the first and third requirement. Moreover, the Court finds that the second requirement is met as well. As dramatically demonstrated by the dashcam video, Sgt. Allen <u>immediately</u> noted the incriminating character of the air compressor (the new paint job and the amateurish and suspiciously-placed welds) and <u>immediately</u> believed that the air compressor contained contraband.

16

However concluding that the plain view doctrine applies does not completely resolve the dispute. As recently noted by another district court, "[s]imply put, the plain view doctrine provides an exception to the warrant requirement for the seizure of property, it does not provide an exception for a search." *United States v. Mosley*, 2014 WL 5454575, op. at *22 (N.D. Iowa Oct. 27, 2014) (*citing United States v. Jackson,* 131 F.3d 1105, 1108 (4th Cir. 1997)). In this case, of course, the officers did more than seize the air compressor, they searched and, based on such preliminary search, arrested Salgado.

In a still-evolving area of the law, federal courts have considered the circumstances when plain view permits an officer to open and search a suspicious container that is opaque as to its contents. *See*, *e.g.*, Allison M. Lucier, *You Can Judge A Container by Its Cover: The Single-Purpose Container Exception and the Fourth Amendment*, 76 U. CHI. L. REV. 1809, 1812 (2009). A representative case in the Eighth Circuit is *United States v. Banks*, 514 F.3d 769, 773-74 (8th Cir. 2008).

In *Banks*, police undertook a search of the defendant's (a prior felon) bedroom after his girlfriend consented to the search. During the search, the officers found a locked, plastic container bearing the words "PHOENIX ARMS." *Id*. at 772. An officer "loosened a hinge" on the container and found a semi-automatic pistol and ammunition. Following a conviction for being a felon in possession, the defendant appealed challenging the search of the container. After discussing the plain view doctrine, the Eighth Circuit reasoned:

> [W]e consider whether police should have obtained a warrant before they opened the Phoenix Arms container. Observing objects in plain view violates no reasonable expectation of privacy, which obviates the need for a search warrant. Ordinarily, a warrant is necessary before police may open a closed container because by concealing the contents from plain view, the possessor creates a reasonable expectation of privacy. However, like objects that sit out in the open, the contents of some containers are treated similarly to objects in plain view. [The Supreme

> Court has] suggested that no warrant is required to open such containers [because] some containers . . . by their very nature cannot support a reasonable expectation of privacy because their contents can be inferred from their outward appearance.

Id. at 773-74. The Court in *Banks* recognized the potential slippery slope attendant to its reasoning and made it clear that it did "not wish [its] statement of the single-purpose container rule to be read such that [it] authorize[s] police to open any seemingly innocuous single-purpose container." *Id*. at 774.

> If we allow police to open any single-purpose container they lawfully come across we would be authorizing exploratory searches of containers where a reasonable person would rightfully expect privacy: for example, police could open violin cases and guitar bags, look inside cereal boxes and bread baskets, or empty out clothes hampers and jewelry boxes <u>without even a suspicion that these containers hold evidence of a crime</u>.

*Id.* In this case, however, Sgt. Allen did have a reasonable suspicion that the air compressor held evidence of a crime. These concerns were heightened when the officers noted that the air compressor was heavier than normal and when non-intrusive testing of the air tank indicated that the tank was not hollow. The Court does not find these initial tests to fall within the prohibitions set out by the Supreme Court in *Kyllo v. United States*. 533 U.S. 27, 40, 121 S. Ct. 2038, 2046 (2001) (involving thermal imaging). The Court concludes that at that point, given the totality of the circumstances, Sgt. Allen did have probable cause to seize the air compressor. Consequently, applying the reasoning of *Banks*, the Court concludes that the officers were justified in removing the peacock and searching the air compressor (first visually and then by use of a probe). *Compare Banks*, 514 F.3d at 774 (noting that the Supreme Court has suggested that the single-purpose container rule should be interpreted so that "containers would be protected by requiring police to have probable cause to seize the container before they may open it" [*citing Arizona v. Hicks*, 480 U.S. 321, 326-27, 107 S. Ct. 1149, 1153 (1987)]).

18

In accordance with the foregoing discussion, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** Murillo-Salgado's motion to suppress [Doc. 27].

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

               */s/ John T. Maughmer*
               **John T. Maughmer**
              **United States Magistrate Judge**

19

Case 4:14-cr-00115-DW   Document 37   Filed 09/08/15   Page 19 of 19